IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 3:23-CR-00011 |
| ) | |
| RICK TARIQ RAHIM, ) | |
| ) | |
| Defendant. ) | |

**UNITED STATES' SENTENCING MEMORANDUM**

Rick Rahim paid Culpeper Sheriff Scott Jenkins over $25,000 in exchange for being appointed as an auxiliary deputy sheriff and getting his firearms rights restored. Rahim also recruited his business associate, Fredric Gumbinner, who paid $20,000 to become an auxiliary deputy sheriff. After being indicted, Rahim accepted responsibility for his conduct by pleading guilty and testified as a witness for the Government at Jenkins' trial. Considering all relevant factors, the Government respectfully requests that the Court sentence Rahim to 27 months of imprisonment.

## I. BACKGROUND

### A. Procedural History

On June 28, 2023, Rahim was indicted alongside three co-defendants—Scott Jenkins, Fredric Gumbinner, and James Metcalf—on charges arising from a sprawling bribery scheme in which Jenkins accepted bribes in exchange for appointments as auxiliary deputy sheriffs, a volunteer sworn law-enforcement position. *See* ECF No. 3. On April 22, 2024, Rahim pleaded guilty pursuant to a plea agreement to one count of conspiracy to commit federal programs bribery and honest services mail fraud, in violation of 18 U.S.C. § 371, and one count of honest services mail fraud, in violation of 18 U.S.C. § 1341. *See* ECF Nos. 117–119. Gumbinner and Metcalf subsequently pleaded guilty, also pursuant to plea agreements. *See* ECF Nos. 78–80 (Gumbinner); ECF Nos. 89–90, 102 (Metcalf). On June 12, 2024, Jenkins was charged by superseding indictment with one count of conspiracy in violation of 18 U.S.C. § 371, four counts of honest-

services mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343 & 1346, and seven counts of bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B)). ECF No. 133.

Jenkins elected to proceed to trial. At trial, Jenkins' three co-defendants testified against him, including Rahim. On December 18, 2024, after approximately two hours of deliberations, the jury found Jenkins guilty on all counts. *See* ECF No. 271.

### B.  Summary of Facts Established at Trial

From 2012 through 2023, Jenkins served as the elected Sheriff of Culpeper County, Virginia. As Sheriff, Jenkins had authority to appoint auxiliary deputy sheriffs—volunteer, sworn law-enforcement officers who could be called into service to supplement the Sheriff's Office's law-enforcement capabilities. *See* 12/12/24 Tr. at 50:24–52:11 (Siebel).

Auxiliary deputies were issued official Culpeper County Sheriff's Office badges as well as credentials identifying them as a "duly sworn and qualified deputy sheriff vested with the powers and authorized to perform all duties of that office." *See, e.g.*, G515 (Metcalf badge), G516 (Metcalf credentials); 12/12/24 Tr. at 65:2–8 (Siebel). The card identified them as an auxiliary only on the back, in the section listing their "rank." *See, e.g.*, G516.

Jenkins had a longstanding relationship with Kevin Rychlik, a Northern Virginia businessman. During his 2019 reelection campaign, Jenkins reached out to Rychlik to solicit his help in recruiting more bribe payors to contribute to his campaign. *See* 12/16/24 Tr. at 29:9–30:2 (Rychlik); G101, at 1–2. Rychlik responded that he had caught a "big fish," referring to Rick Rahim. G101, at 2. Rahim, a longtime associate of Rychlik's, was a wealthy businessman residing in Northern Virginia. *See* 12/12/24 Tr. 107:13–109:10 (Rahim). Several decades prior, Rahim had been convicted of a non-violent felony offense, and as a result had lost his right to possess firearms. *Id.* at 111:18–24. Under Virginia law, a convicted felon could petition the Circuit Court in the county of his residence to restore his firearms rights. *Id.* at 125:9–11; 12/13/24 Tr. at 10:17–12:3 (Owens). Rahim wanted Jenkins to use his official position to help him get his firearms rights

2

restored in Culpeper Circuit Court and wanted to become an auxiliary deputy. 12/12/24 Tr. at 112:12–16 (Rahim).

Rychlik organized a meeting between Jenkins, Rychlik, and Rahim. *See* 12/12/24 Tr. at 115:4–10 (Rahim); 12/16/24 Tr. at 36:9–17 (Rychlik). On July 31, 2019, the three met in Jenkins' personal office at the Sheriff's Office. *See* 12/16/24 Tr. at 39:9–21 (Rychlik). During that meeting, Jenkins agreed to use his official position to help Rahim gain approval for his firearms rights restoration petition and to swear Rahim in as an auxiliary deputy in exchange for bribes. *See* 12/12/24 Tr. at 133:8–24 (Rahim); 12/16/24 Tr. at 41:2–12 (Rychlik). After the meeting, in the cab of Jenkins' pickup truck, Rahim handed Jenkins a $15,000 cash bribe in a manila envelope. *See* 12/12/24 Tr. at 135:24–136:11 (Rahim); 12/16/24 Tr. at 41:13–42:16 (Rychlik). At a dinner meeting several weeks later, Rahim gave Jenkins an additional $10,000 cash bribe. *See* 12/12/24 Tr. at 152:6–22 (Rahim). Neither of Rahim's cash bribes was deposited into Scott Jenkins for Sheriff's bank account or reported on its campaign finance reports filed with the Virginia Department of Elections. *See* 12/17/24 Tr. at 91:17–24 (Medearis); G301.

At the same dinner meeting, Rahim gave Jenkins two checks for $17,500 each, one from Rahim's own business and one from an associate of Rahim's, as a purported loan for the construction of Jenkins' home. 12/12/24 Tr. at 152:10–14 (Rahim); G729. Jenkins laundered the funds by depositing them into his brother's bank account then initiating a series of cash and check withdrawals, some of which were deposited into his own personal bank account. *See* 12/17/24 Tr. at 96:10–101:20 (Medearis). He then failed to disclose that liability on mortgage applications filed with two separate banks. *Id*. at 105:1–107:17. Jenkins never repaid the $17,500 he owed to Rahim. *See* 12/12/24 Tr. at 155:9–25 (Rahim).

Jenkins soon began to deliver on his end of the corrupt bargain. Because Rahim was not yet eligible to become an auxiliary deputy, Jenkins issued him a custom-made identification card identifying him as a "member" of the Culpeper County Sheriff's Office with the "position" of "Helicopter Pilot." G107; 12/12/24 Tr. at 234:1–7 (Rahim). To make it appear that Rahim was a resident of Culpeper County—and therefore eligible to file his firearms rights restoration petition

3

in Culpeper Circuit Court—Jenkins arranged for Rahim to enter a sham lease agreement on an old farmhouse owned by Jenkins' brother, Michael Jenkins. *Id.* at 177:4–181:12. Rahim executed the agreement and paid Michael Jenkins $3,000 in purported rent but never set foot inside the property. *Id.* at 180:25–182:17; G730; G317. Rahim then filed his petition in Culpeper Circuit Court falsely representing that he was "a resident of Culpeper County." G720. When the Deputy Commonwealth's Attorney called Jenkins to verify Rahim's residency in Culpeper County, Jenkins falsely told him that Rahim lived at the farmhouse. *See* 12/13/24 Tr. at 21:11–24:24 (Owens); G740.

Over the summer of 2020, Jenkins repeatedly told Rahim he was pressuring other local officials, such as the Commonwealth's Attorney, to approve his petition. *See* 12/12/24 Tr. at 197:20–206:9 (Rahim). Subsequently, when Rahim grew impatient with how long it was taking to get a hearing on his petition due to the Covid-19 pandemic, Jenkins called the presiding judge and asked him to move up Rahim's hearing date, which the judge did. *See* 12/13/24 Tr. at 67:13–71:20 (Durrer). At the hearing, Rahim falsely testified that he resided in Culpeper County and the judge granted his petition. *Id.* at 72:17–73:6. Later on, Jenkins swore Rahim in as an auxiliary deputy sheriff and issued him badges, credentials, a uniform, and a duty firearm. *See* 12/12/24 Tr. at 237:4–246:2 (Rahim).

Jenkins also asked Rahim to solicit others to pay bribes in exchange for auxiliary badges. *See id.* at 258:1–19. Rahim approached one of his business associates, Fredric Gumbinner. *Id.* at 258:20–259:22. Rahim and Gumbinner agreed that Gumbinner would make a $20,000 "donation" to Jenkins in exchange for becoming an auxiliary deputy. *Id.* at 259:23–260:25; 12/13/24 Tr. at 170:9–19 (Gumbinner). On October 1, 2019, Gumbinner wrote a $20,000 check to one of Rahim's companies, Food Truck Company LLC, which Rahim deposited into a business account. 12/12/24 Tr. at 264:17–265:21 (Rahim); 12/17/24 Tr. at 113:11–15 (Medearis); G308. The following day, Rahim arranged a meeting with Jenkins, where he gave Jenkins $20,000 in cash. *See* 12/12/27 Tr. at 267:7–269:20 (Rahim). Gumbinner's bribe money was not deposited into Scott Jenkins for

4

Sheriff's bank account or reported on its campaign finance reports. *See* 12/17/24 Tr. at 112:10–19 (Medearis): G301.

After Jenkins won reelection, Rahim introduced Gumbinner to Rychlik and explained that Gumbinner helped provide "support"—meaning bribes—to Jenkins and expected to be deputized. G115. Over the course of several months, Rychlik pushed Jenkins to set a date for Gumbinner's swearing in, reminding Jenkins that Gumbinner expected to be deputized in exchange for the money he had given Jenkins. G106. Gumbinner was sworn in on March 6, 2020. G707. Gumbinner received no training and never rendered any service to the Sheriff's Office. 12/13/24 Tr. at 185:3–17 (Gumbinner).

## II. DISCUSSION AND RECOMMENDATION

### A. Sentencing Guidelines Calculation

The Government agrees with the Probation Office that Rahim's Base Offense Level is 12, *see* U.S.S.G. § 2C1.1(a)(1); that Rahim should receive a two-level enhancement for the scheme involving more than one bribe, *see* U.S.S.G. § 2C1.1(b)(1); a six-level enhancement because the payment was more than $40,000 but less than $95,000, *see* U.S.S.G. § 2C1.1(b)(2); and that Rahim should receive a four-level enhancement because the offense involved an elected public official, *see* U.S.S.G. § 2C1.1(b)(3). Finally, Rahim should receive a two-level reduction for acceptance of responsibility, *see* U.S.S.G. § 3E1.1(a). At sentencing, the Government will move for an additional one-level reduction for Rahim's assistance to authorities, *see* U.S.S.G. § 3E1.1(b), resulting in a total offense level of 21. *See* PSR, ECF No. 295 ¶¶ 25-28, 34-36.

Since the Final PSR was released on March 4, 2025, on March 18, 2025, Rahim was sentenced to 60 months of imprisonment in the Eastern District of Virginia for willful failure to account for and pay taxes, *United States v. Rahim*, 23 CR 173 CMH, ECF No. 79 (E.D. Va. 2025), and 78 months for wire fraud, *United States v. Rahim*, 24 CR 179 CMH, ECF No. 46 (E.D. Va.

2025).[1] The sentences were imposed on the same day to run concurrent to each other.[2] The crimes were separated by an intervening arrest, and thus are counted as separate crimes under the Sentencing Guidelines. *See* § 4A1.2(a)(2). Accordingly, the two convictions should result in six criminal history points and a criminal history category of III, corresponding to a Guidelines range of 57 to 71 months.[3]

### B.      The 18 U.S.C. § 3553(a) Factors

The Supreme Court has advised that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). And while those Guidelines serve as one factor among several that courts must consider in determining an appropriate sentence, it remains that "the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 90, 108–09 (2007) (internal quotation marks omitted). Thus, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

As discussed more fully below, the § 3553(a) factors support the Government's recommended sentence of 27 months. That sentence is warranted due to Rahim's extensive involvement in this brazen bribery scheme while taking into account Rahim's acceptance of responsibility and testimony at trial.

---

[1] Under the Sentencing Guidelines, "[i]n any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." U.S.S.G. § 5G1.3.

[2] On April 11, 2025, Rahim filed a notice of appeal from the judgment in both cases.

[3] The Government notes that Rahim's sentencing in the instant case could have proceeded prior to the sentencings in the other two case after the jury trial concluded in December 2024. Had that been the case, Rahim would have been in criminal history category II, corresponding to a Guidelines range of 41 to 51 months. *See* PSR, ECF No. 295 ¶ 74.

6

1. *The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))*

Both the nature and circumstances of the offense and Rahim's history and characteristics weigh in favor of the Government's recommended sentence. Rahim engaged in an extensive and multi-year bribes for badges corruption scheme. Rahim entered the scheme knowingly and for self-serving reasons. He was under no duress nor any illusion about the nature of the scheme. Indeed, the trial evidence demonstrated that he was aware of the corrupt *quid pro quo*. Moreover, he swore an oath of office as an auxiliary deputy knowing he had no relevant qualifications and with no intention to perform any legitimate services for Culpeper County. Instead, he used his badge to seek preferential treatment such as avoiding speeding tickets. In fact, Rahim continued to use the Culpeper County auxiliary deputy badge for that purpose *after* he was indicted in this case.

Rahim went further than any other bribe payor in this scheme. He not only used his wealth to purchase an auxiliary deputy badge, but he also bribed Jenkins to help him illegally restore his firearms rights. With Jenkins' assistance, Rahim filed false paperwork with the Culpeper County Clerk and lied under oath to a Culpeper Circuit Court judge. Unlike the other bribe payors in this case, Rahim's involvement was extensive and involved more than a single payment. It was a methodical series of payments, in-kind donations, and fabrications to obtain entitlements.

Beyond the conduct in this case, the Court should consider that Rahim engaged in other criminal conduct in the Eastern District of Virginia (EDVA), which involved entirely separate criminal schemes but overlapped with the time period of the instant offense. Rahim has been convicted of two criminal cases in EDVA. In October 2023, Rahim was indicted for tax-related offenses in EDVA, *see United States v. Rahim*, No. 23 CR 173 CHM (E.D. Va. filed Oct. 25, 2023). The period of conduct in that case was from approximately September 2016 to October 2021. PSR ¶ 47. On March 15, 2024, Rahim pleaded guilty pursuant to a plea agreement to willful failure to account for and pay for taxes in EDVA. *Id.* ECF No. 33, 34. Second, in August 2024, Rahim pleaded guilty to wire fraud in EDVA. *See United States v. Rahim*, No. 24 CR 179 RDA (E.D. Va. filed Aug. 13, 2024). The period of conduct in that case was from approximately

November 2015 to August 2022. PSR ¶ 48. As noted above, he has now been sentenced in those two cases. That Rahim engaged in multiple other criminal schemes simultaneous to his corrupt scheme with Jenkins weighs in favor of a meaningful custodial sentence in this case and the Government's proposed sentence of 27 months reflects the full extent of Rahim's criminal conduct.

> 2. *The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment, and to Afford Adequate Deterrence and Protect the Public (18 U.S.C. § 3553(a)(2))*

The Court should impose a sentence of 27 months to reflect the serious nature of the misconduct in this case, to promote respect for the rule of law, and to punish Rahim for his crimes. The bribery scheme at issue in this case gravely undermined public trust in law enforcement and the political process, without which our public institutions cannot function. By participating in the scheme, Rahim sought to obtain special privileges and status reserved for law enforcement officers without the concomitant sacrifice, danger, or commitment to public service. That conduct warrants a sentence of imprisonment.

Furthermore, a sentence of imprisonment is necessary to afford adequate deterrence to others who may seek to corrupt the political process to serve private needs. "Congress has recognized that general deterrence is particularly important in the context of white collar crime." *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018). That is because "[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *Id.* (internal quotation marks and citation omitted). Conversely, "[i]n imposing minimal sentences on white-collar criminals, courts 'raise concerns of sentencing disparities according to socio-economic' status." *Id.* at 1201 (quoting *United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008)). Thus, the Court should impose the sentence of imprisonment recommended by the Government.

8

> 3. *The Need to Avoid Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6))*

The Guidelines are the primary means available for assuring some measure of uniformity in sentencing, thereby fulfilling a key congressional goal in adopting the Sentencing Reform Act of 1984. The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533. A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall*, 552 U.S. at 54.

As noted above, the Government respectfully requests a sentence of 27 months. Aside from the reasons set forth therein, which will be further elaborated at sentencing, there are no factors weighing in favor of any additional departure or variance from the applicable Guidelines. Rahim is likely more culpable than an average defendant sentenced under the 2C1.1(a)(2) Guideline and is more culpable than his co-defendant bribe payors.[4] The amount of his bribe payment was substantial, he received additional benefits, and he recruited another individual into the scheme. Further, his conduct, unlike a typical bribery scheme, implicated sensitive law enforcement and public safety interests. Thus, a sentence of 27 months is not greater than necessary to meet the goals of sentencing.

---

[4] The Court sentenced co-defendants and bribe-payors Frederic Gumbinner and James Metcalf to three years of probation. ECF Nos. 317, 319.

### III.   CONCLUSION

The Government respectfully requests that the Court sentence the defendant, Rick Rahim, to 27 months imprisonment.

Respectfully submitted,

ZACHARY T. LEE
ACTING UNITED STATES ATTORNEY

By: */s/Melanie Smith*
 MELANIE SMITH
 VA Bar No. 82663
 Assistant United States Attorney
 255 West Main Street, Room 130
 Charlottesville, VA 22902
 (434) 293-3180
 melanie.smith@usdoj.gov

By: */s/ Lina Peng*
 LINA PENG
 NY Bar No. 5150032
 Trial Attorney
 U.S. Department of Justice
 Public Integrity Section
 1301 New York Ave. NW, 10th Floor
 Washington, DC 20530
 (202) 514-1412
 lina.peng@usdoj.gov

### Certificate of Service

I hereby certify that a true and correct copy of the foregoing has been electronically filed with the Clerk by CM/ECF system, which will send notification of such filing to counsel of record, on this 20th day of May, 2025.

s/*Melanie Smith*